

FILED - WESTERN DIVISION
CLERK, U.S. DISTRICT COURT

MAR - 6 2008

CENTRAL DISTRICT OF CA..
BY

1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| CARL BROWN,<br><br>   Petitioner,<br><br> v.<br><br>K. PROSPER, Warden,<br><br>   Respondent. | No. CV 07-190-JSL  (AGR)<br><br>ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION |

Pursuant to 28 U.S.C. § 636, the Court has reviewed the entire file *de novo*, including the Petition, the Magistrate Judge's Report and Recommendation ("R&R"), the Objections to the R&R, and all of the records in the file.  Having made a *de novo* determination, the Court agrees with the recommendation of the Magistrate Judge.

Respondent's Objections argue, for the first time, that Ground Nine was not exhausted.  Respondent expressly waived the exhaustion requirement in its Answer, filed March 19, 2007, stating "[t]hat the Petition is not barred by a failure to exhaust state remedies."  (Answer at 2); 28 U.S.C. § 2254(b)(3);[1] *see Pike v. Guarino*, 492 F.3d 61, 72 (1st Cir.) (finding express waiver), *cert. denied sub nom. Pike v.*

---

[1] Section 2254(b)(3) provides: "A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement."

1  *Bissonette*, 128 S. Ct. 716 (2007); *Clemons v. Luebbers*, 381 F.3d 744, 752 (8th Cir.
2  2004) (response to habeas petition expressly waived exhaustion), *cert. denied*, 546
3  U.S. 828 (2005); *Dorsey v. Chapman*, 262 F.3d 1181, 1187 (11th Cir. 2001) (same),
4  *cert. denied*, 535 U.S. 1000 (2002); *Bledsue v. Johnson*, 188 F.3d 250, 254 (5th Cir.
5  1999) (same).

6        Respondent's Objections argue for rescission of the waiver on the ground that
7  Petitioner's Traverse filed on July 15, 2007, cited for the first time to *Mooney* and
8  *Napue* in support of Ground Nine. (Objections at 8; Traverse at 22-28.)  This
9  argument is not well taken.[2]  Ground Nine was based on the denial of Petitioner's
10  motion for new trial in the trial court, which stated he "was deprived of a fair trial" in
11  violation of his due process rights due to "fabricated evidence and perjured testimony
12  which was used against the defendant at trial" and "[t]he court failed to protect the
13  defendant's constitutional rights." (LD 1 at 221-222, 236.)  The supporting
14  declaration stated that "the prosecutor on this case is fully aware that her trial exhibits
15  are fabricated, (and antedated) and that her witnesses committed perjury on
16  practically every material, disputed point at trial." (*Id.* at 224.)  The accompanying
17  memorandum cited the Supreme Court's *Giglio* decision and the Ninth Circuit's
18  *Phillips v. Woodford* decision, both of which addressed the state's use of false
19  evidence under *Napue*.[3]  (*Id.* at 237, 240.)  Respondent's Answer argued that the trial
20  court's findings of fact were not unreasonable and that its conclusions of law were
21  neither contrary to nor an unreasonable interpretation of clearly established federal
22  law.  (Answer at 23 (citing *id.* at 4-12).)  Respondent was on notice that Petitioner

23  ――――――――――

24    [2]  Petitioner used a Central District of California form Petition for Writ of
Habeas Corpus that instructs the petitioner to state each ground and to "tell your
25  story BRIEFLY *without citing cases or law*." (Petition at 5, emphasis added.)
Petitioner's Traverse cited *Mooney v. Holohan*, 294 U.S. 103, 55 S. Ct. 340, 79 L.
26  Ed. 2d 791 (1935); *Napue v. Illinois*, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d
1217 (1959).

27
28    [3]  *Giglio v. United States,* 405 U.S. 150, 151, 92 S. Ct. 763, 31 L. Ed. 2d 104
(1972); *Phillips v. Woodford*, 267 F.3d 966, 984-85 (9th Cir. 2001).

1  was asserting a fabricated evidence claim when it expressly waived exhaustion as a

2  defense in its Answer.  Even after Petitioner filed the Traverse,  Respondent never

3  requested leave to amend its Answer.[4]  *See Day v. McDonough*, 547 U.S. 198, 209,

4  126 S. Ct. 1675, 164 L. Ed. 2d 376 (2006) (citing 28 U.S.C. § 2243).  Respondent

5  cannot wait until after the Magistrate Judge recommends that the petition be granted.

6  Under these circumstances, there is no basis for rescission of Respondent's express

7  waiver.[5]

8          The First Circuit[6] rejected a similar argument by a respondent seeking to

9  rescind a waiver after a habeas petitioner refined her ground for relief in a

10  memorandum of law.  "It is no secret that waivers are strong medicine, not casually to

11  be dispensed.  A party who chooses to waive a defense surrenders that defense as

12  to the claim asserted and any claim fairly encompassed within it."  *Pike*, 492 F.3d at

13  72.  "Nor is the fact that the labeling of the claim changed over time sufficient to

14  warrant rescission of the waiver; to the extent that the claim was vague or not

15  specifically identified in *haec verba* as a competence claim, it was incumbent upon

16  the waiving party to use caution in the exercise of the waiver."  *Id.* at 73.

17          Respondent's remaining arguments are without merit based on the reasons set

18  forth in the R&R.  *See Wiggins v. Smith*, 539 U.S. 510, 526-29, 123 S. Ct. 2527, 156

19  L. Ed. 2d 471 (2003); *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L.

20

21      [4]    The Magistrate Judge *sua sponte* permitted Respondent to file a
   Supplemental Answer to Ground 11 upon discovering that Respondent's Answer
22  had not addressed that ground.  (Order dated July 25, 2007.)  Respondent's
   Supplemental Answer to Ground 11, filed on August 15, 2007, made no request
23  for leave to amend or supplement its Answer as to Ground Nine.

24      [5]    Although Respondent argues that Petitioner's state petition for review
   before the California Supreme Court made the fabricated evidence argument
25  under another heading, the Supreme Court has left open the question of whether
   a *Napue/Giglio* ground for relief must be pleaded separately from a *Brady* claim.
26  *Banks v. Dretke*, 540 U.S. 668, 690 n.11, 124 S. Ct. 1256, 157 L. Ed. 2d 1166
   (2004); *Morris v. Ylst*, 447 F.3d 735, 743 n.8 (9th Cir. 2006), *cert. denied*, 127 S.
27  Ct. 957 (2007).

28      [6]    Judge Tashima of the Ninth Circuit sat on the panel by designation.

1  Ed. 2d 931 (2003); *Jackson v. Brown*, 2008 U.S. App. LEXIS 1266, at *45-*55 (9th

2  Cir. Jan. 23, 2008).[7]

3        IT IS ORDERED that the Magistrate Judge's Report and Recommendation is

4  adopted.

5        IT IS FURTHER ORDERED that (1) a conditional writ of habeas corpus is

6  granted as to Ground Nine with respect to Petitioner's conviction on counts 1 and 2 in

7  Los Angeles County Superior Court Case No. VA071021; (2) Respondent shall

8  discharge Petitioner from all adverse consequences of his convictions on counts 1

9  and 2 in Los Angeles County Superior Court Case No. VA071021, unless Petitioner

10  is brought to retrial on said counts within ninety (90) days of the date the Judgment

11  herein becomes final, plus any additional delay authorized under state law; and (3)

12  the Petition is otherwise denied.

13        IT IS FURTHER ORDERED that Judgment be entered accordingly.

14

15  DATED: March 6, 2008

         *Spencer Letts*

16           J. SPENCER LETTS
         United States District Court Judge

17

18

19

_____

20      [7]  Respondent's Objections concede the photograph could not have been

21  taken on the day of the incident. (Objections at 17.)  The R&R pointed out that
the trial court's finding on the motion for new trial contradicted the trial court's

22  previous factual finding, in ruling on jury instructions, that according to the
evidence, the photograph was taken before the receipt was generated, which no

23  one disputes occurred on the day of the incident (LD 2 at 94, 132-34).  (R&R at
18-19.)  Contrary to Respondent's argument, the existence of contradictory

24  factual findings by the trial court may properly be considered in determining
whether a state court made an unreasonable determination of the facts.

25      Although not necessary to the decision, Respondent's argument that
Petitioner may not rely on the prosecutor's representations appears to be

26  incorrect. (Objections at 16.)  *See Banks*, 540 U.S. at 698 ("It was not incumbent
on Banks to prove the[ prosecutors'] representations false; rather, Banks was

27  entitled to treat the prosecutors' submissions as truthful."); *id.* at 694 (Petitioner
may "assume that his prosecutors would not stoop to improper litigation conduct

28  to advance prospects for gaining a conviction").

1
2
3
4
5
6
7
8              UNITED STATES DISTRICT COURT
9              CENTRAL DISTRICT OF CALIFORNIA
10
11    CARL BROWN,                    )        NO. CV 07-190-JSL (AGR)
12              Petitioner,          )
13         v.                        )
14    K. PROSPER, Warden,            )        REPORT AND
                                     )        RECOMMENDATION OF UNITED
15              Respondent.          )        STATES MAGISTRATE JUDGE
16                                   )
17    _____)
18         The Court submits this Report and Recommendation to the Honorable J.
19    Spencer Letts, United States District Judge, pursuant to 28 U.S.C. § 636 and
20    General Order No. 05-07 of the United States District Court for the Central District
21    of California.  For the reasons set forth below, the Magistrate Judge recommends
22    the Petition for Writ of Habeas Corpus be granted.
23    ///
24    ///
25    ///
26    ///
27    ///
28    ///

# I.

## SUMMARY OF PROCEEDINGS

On January 15, 2003, a Los Angeles County Superior Court jury convicted Petitioner of second degree robbery and petty theft with a prior; the trial court found true allegations of prior serious or violent felony convictions. (Petition at 2; Answer at 1.)  On April 2, 2003, Petitioner, as a second-strike defendant, was sentenced to 15 years in prison under California's Three Strikes Law. (*Id.*)  On June 25, 2004, the California Court of Appeal affirmed Petitioner's conviction in an unpublished decision. (Answer, Ex. C ("Decision").)  On September 15, 2004, the California Supreme Court denied review "without prejudice to any relief to which defendant might be entitled after this court determines in *People v. Black*, S126182, and *People v. Towne*, S125677, the effect of *Blakely v. Washington* (2004) __ U.S. __ S. Ct. 2531, on California law." (*Id.*, Ex. E.)

On November 4, 2005, Petitioner filed a habeas corpus petition in the California Court of Appeal, which was denied without explanation on December 9, 2005. (*Id.*, Exs. F, G.)  On January 26, 2006, Petitioner filed a habeas corpus petition in the California Supreme Court, which was denied without explanation on November 29, 2006. (*Id.*, Exs. H, I.)

Pursuant to 28 U.S.C. § 2254, Petitioner filed a Petition for Writ of Habeas Corpus by a Person in State Custody in this Court on January 8, 2007, in which he raised eleven grounds:  (1) failure to preserve evidence, (2) delayed disclosure of evidence, (3) denial of due process in trial court's refusal to instruct the jury on the late disclosure of evidence, (4) ineffective assistance of appellate counsel on direct appeal, (5) denial of due process by not receiving full hearing on motion to suppress, (6) ineffective assistance of trial counsel in not serving subpoenas on trial witnesses, (7) denial of fair trial because the court failed to give a jury instruction, (8) denial of fair trial because trial court admitted unauthenticated writings, (9) wrongful denial of Petitioner's motion for a new trial,

2

1    (10) denial of fair trial because trial court gave "an argumentative jury instruction,"

2    and (11) a *Blakely* sentencing claim related to imposition of an upper term.

3    (Petition at 5-6.)

4          Respondent filed an answer on March 19, 2007, admitting exhaustion and

5    timeliness.  (Answer at 1-2.)  Petitioner filed a traverse on July 15, 2007.  On July

6    25, 2007, the Court ordered Respondent to file a supplemental answer with

7    respect to Ground Eleven.  On July 27, 2007, Petitioner filed a supplement to his

8    traverse.  On August 15, 2007, Respondent filed a Supplemental Answer to

9    Ground 11.  On September 7, 2007, Petitioner filed an Amendment and

10   Supplemental Traverse as to Ground 11 ("Supplemental Traverse").

11         This matter was taken under submission and is now ready for decision.

12                                           II.

13                             **STATEMENT OF FACTS**

14   **A.    The Underlying Offense**

15         Below are the facts set forth in the California Court of Appeal decision on

16   direct review.  To the extent an evaluation of Petitioner's claims for relief depends

17   on an examination of the record, the Court has made an independent evaluation

18   of the record specific to Petitioner's claims for relief.

19              On May 11, 2002, a plainclothes security guard named Ricardo

20              Rojas was working in the men's clothing department of a Wal-Mart

21              store in Lakewood. Rojas noticed that appellant was looking around

22              suspiciously and had an open backpack in his shopping cart. Rojas

23              assumed the backpack belonged to appellant. From a distance, he

24              watched appellant select items of men's clothing and put them into

25              the cart. He then followed appellant to the hardware department.

26              Appellant put a power drill set and the clothing from the men's

27              department into the backpack, and zipped it up. He proceeded

28              towards the front of the store and stopped at a baseball cap display.

                                            3

1    He selected a cap, ripped out the bar code numbers, and put the cap
2    in his pocket. He then walked out of the store wearing the backpack,
3    without paying for the merchandise.
4    Rojas approached appellant outside the store and identified himself
5    as store security. Appellant swung a fist at Rojas's face, but missed.
6    Rojas grabbed him by the shoulders, forced him to the ground, and
7    held him there. Another store employee, Kaipo Doctolero, assisted
8    Rojas in restraining appellant, who was struggling and kicking. The
9    sheriff's department was called, and appellant was arrested.
10   Rojas saw the power drill set and men's clothing items inside the
11   backpack. He had a cashier ring up the stolen merchandise on her
12   cash register. The first receipt she produced contained only the
13   clothing items. Rojas had her make up a second receipt for the drill.
14   That receipt stated that the drill was cordless. According to a
15   photograph which Rojas took of the stolen merchandise, the drill had
16   a cord. The discrepancy may have resulted from mismarking or a
17   switching of tags.
18   (Decision at 2-3.)

19      **B.    Rojas's Photograph**

20      Petitioner contends that the evidence against him was fabricated and false.
21   (LD 1 at 224-25.)  The facts relevant to Petitioner's claim are set forth below in
22   some detail.

23      On January 13, 2003, just before the court brought in the jury panel for voir
24   dire, a discussion occurred between the judge, the prosecutor, and Petitioner,
25   who represented himself.  The prosecutor notified the Court and Petitioner that
26   Rojas, "the People's primary witness," had just informed her that "he thinks he
27   took photographs of the merchandise he recovered from Mr. Brown."  Petitioner
28   ///

4

objected that the photographs were appearing at the eleventh hour, when he had been told there were no photographs throughout discovery. (LD 2 at 21-23.)

Voir dire was completed and a jury selected on January 13, 2003. (*Id.* at 28.)  On January 14, 2003, another discussion occurred between the judge, the prosecutor, and Petitioner:

> PROSECUTOR:  I indicated to the Court yesterday that I had
> information that there might be photographs of the recovered goods.
> As the Court can see, Mr. Rojas is present today.  That's the
> People's witness, the loss prevention officer.  And we do in fact have
> two photographs which I'm showing to Mr. Brown.  [¶]  Now, I realize
> the People have some explaining to do, and here goes.  Your Honor,
> we had a discovery hearing in this matter.  In fact I have in my file a
> letter I wrote to Detective Schmid, who is the investigating officer in
> this case.  [¶]  And Detective Schmid in fact came in at some point in
> time while this case was in Department M and assured me that we
> had all the discovery, which was turned over to Mr. Brown.  [¶]  I
> found out this morning what happened.  Mr. Rojas tells me that he
> told Deputy Zimmerman, who was the arresting deputy, that he had
> taken a couple of pictures, and asked Deputy Zimmerman if he
> wanted a copy.  Deputy Zimmerman inexplicably said, "No, we don't
> need to fool with that," which is the reason the People didn't turn
> them over to Mr. Brown earlier.  We didn't have them either.  The
> police – or the Sheriff's Department didn't have them.  [¶]  Your
> Honor, I do realize this is late discovery, but I don't think it's any
> unfair surprise.  Mr. Brown knows what's in his backpack, what was
> in his backpack, or what was alleged to be in his backpack.  He has
> the police report with the items listed.  [¶]  I'd like to use these

5

1    photographs simply because, as everybody knows, the jury likes to

2    see pictures of what we're talking about.

3    COURT:  Okay, Mr. Brown.

4    PETITIONER:  Your Honor, the defense made numerous, numerous,

5    from the point that –

6    COURT:  I understand that you've made requests –

7    PETITIONER:  Yes, your Honor.

8    COURT:  – on the prosecution.

9    PETITIONER:  And the prosecution continually stated that there

10   were no photographs.  This is prejudicial, your Honor, Number 1,

11   because they seized the property when they were mandated by law

12   to give property over when they were mandated by –

13   COURT:  Let's not go over that again.  Let's deal with the two

14   photographers (sic).  [¶]  How would it be prejudicial to your case if it

15   comes in?  You're looking at it now.  Your investigator will be here

16   this afternoon, if they want – if he, or you and he, decide that there's

17   some – there should be some basis for rebuttal as to those

18   photographs.

19   PETITIONER:  I mean, first of all, your Honor, there's no means of

20   corroborating when these pictures were taken.  These pictures could

21   have been taken yesterday.

22   COURT:  That has to be done, and you can cross examine the

23   witness when he testifies as to when those pictures were taken, how

24   they were taken, what they represent.  You have the right to cross

25   examine him.

26   PETITIONER:  I think this is totally unfair.

27   COURT:  Just hold on.  Unfair, okay.  All right.  Any other basis for

28   the objection to those two photos?

6

1    PETITIONER:  Yes, your Honor.

2    COURT:  I haven't seen them.

3    PETITIONER:  I have absolutely no means of challenging this

4    evidence.

5    COURT:  Yes, you do, by the witness testifying and as to his

6    credibility.  Let me look at those two.

7    PROSECUTOR:  May I approach, your Honor?

8    COURT:  Yes.  You may come in the well.  [¶]  These two

9    photographs appear to be just one photograph of the same subject

10    matter.

11    PROSECUTOR:  Yes, exactly, your Honor.

12    COURT:  All right.  So what I'm going to have you do, one

13    photograph the People can use.  The objection is overruled.  The

14    second photograph, which depicts the same thing as the first

15    photograph, will go to Mr. Brown, and he can review it and go over it

16    with his investigator.

17    (*Id.* at 33-36.)

18    Rojas was the People's first witness.  (*Id.* at 47.)  Rojas followed Petitioner

19    outside the store and approached him, identifying himself as "store security."  (*Id.*

20    at 56-57.)  Rojas took the backpack, opened it, and took a photograph of the

21    items inside it.  (*Id.* at 65.)

22    Q    Did you take a photograph of those items?

23    A    Yes, I did.

24    Q    Do you have that with you today?

25    A    Yes, I do.

26    * * *

27    PROSECUTOR:  Your Honor, I have here a single photograph of a

28    number of items of merchandise laid out on what appears to be a

1    bench.  You can see items of men's clothing and a Black and Decker

2    drill.

3    [The photograph was marked as People's 1.]

4    Q    Mr. Rojas, I'm now showing you your own photograph, sir.  Do you

5         recognize that photograph?

6    A    Yes, I do.

7    Q    And how do you recognize that photograph?

8    A    It's a picture in front of me.

9    Q    Well, have you seen that picture before?

10   A    Yes, I have.

11   Q    When did you see it first?  When did you first see that photograph?

12   A    The day Mr. Brown – the day I recovered it from Mr. Brown.

13   Q    You recovered the photograph from Mr. Brown?

14   A    The merchandise.

15   Q    Who took the photograph?

16   A    I did.

17   Q    All right.  And does that picture you have in front of you accurately

18        depict all the merchandise you recovered from Mr. Brown?

19   A    Yes.

20   (*Id.* at 65-67.)

21       Rojas also testified on cross:

22   Q    Mr. Rojas, you earlier testified, sir, that you unpacked Mr. Brown's

23        backpack and photographed the items you saw in there?

24   A    Yes, I did.

25   (*Id.* at 144.)  Rojas said at some point after – the testimony is unclear as to

26   precisely when – he took the backpack, with the merchandise inside it, to a

27   cashier and asked her to ring it up.  (*Id.* at 94.)

28

8

1    The People's next witness was Kaipo Doctolero, a Walmart sales

2  employee. (*Id.* at 107-08.)  When he arrived at work on May 11, while still outside

3  the store, he noticed Rojas following Petitioner, who was wearing a backpack,

4  approach Petitioner and identify himself.  (*Id.* at 108-09, 112.)  Doctolero

5  accompanied Rojas into the store and then into the security room where Rojas

6  took the items out of the backpack.  (*Id.* at 114.)

7    Q    Showing you what's previously been marked as People's 1, do you

8        recognize that photograph?

9    A    Yes, I do.

10    Q    How do you recognize it?

11    A    From the drill, the box, the drill box and the hat.

12    Q    Those items stand out in your memory?

13    A    Yes.

14    Q    Where did those items come from?

15    A    The backpack.  Well, the hat, I don't believe it was in the backpack.  I

16        believe it was like – it was either in his pocket or something, because it

17        was around the area of the backpack when we picked it up.

18    Q    But you saw the drill in the backpack, is that a fair statement?

19    A    Yes.

20    * * *

21    Q    Were you in the security room, or were you present when this picture

22        was taken?

23    A    That, I don't recall.

24  (*Id.* at 114-15.)  Doctolero did not see the items scanned.  (*Id.* at 115.)

25    The People then called their third and final witness, Deputy Zimmerman.

26  (*Id.* at 124.)

27

28

9

1    Q  Deputy, I'm about to show you what's previously been marked as

2         People's 1. Will you take a moment to look at that photograph. [¶] Do

3         you recognize the items depicted in that snapshot?

4    A  Yes, ma'am.

5    Q  How do you recognize them?

6    A  These were the items that Mr. Rojas showed me that were recovered

7         from Walmart.

8    Q  Thank you. [¶] Now, when Mr. Rojas showed you these items, were

9         these items loose, or were they in some sort of a container?

10    A  They were loose back in their security office.

11  (*Id.* at 126.)

12       After Zimmerman completed his testimony, the People rested and People's

13  1 (the photograph) was received into evidence. (*Id.* at 139.)

14       During the prosecutor's closing argument, she reviewed the elements of

15  robbery, the first element of which is the taking of property. (*Id.* at 203.)

16  According to the prosecutor, that element was proved by Rojas's testimony:

17      Ladies and gentlemen, you heard the testimony of Mr. Rojas. Mr.

18      Rojas stated that he followed Mr. Brown around the Walmart while

19      Mr. Brown selected various items of Walmart merchandise, hid those

20      items in his backpack, and then walked out of the store without

21      paying for them. That's taking property.

22  (*Id.*)

23       As part of the "surrounding circumstances" to prove specific intent, the

24  prosecutor also argued:

25      What surrounding circumstances have we got? Mr. Brown took this

26      property, Mr. Rojas told us. He put it in his backpack. He didn't

27      leave it in the shopping cart where it was visible. He walks out of the

28

1    Walmart.  He doesn't go through the checkstands where you
2    normally pay for the property.
3    (*Id.* at 205.)

4    The prosecutor further argued that the element of "immediate presence"
5    was proven by Rojas's testimony:

6    It's in the possession of Mr. Rojas.  It's in his constructive possession
7    because he has the right to control it, to control all the merchandise
8    at Walmart.  He, by means of his job as a loss prevention officer, he
9    is charged with the protection of the property.  * * * [¶]  Mr. Brown
10   took the property from the shelves of the display racks.  Mr. Rojas
11   was following him around, but he wasn't in actual possession of the
12   property.

13   (*Id.* at 207-08.)

14   During Petitioner's closing, he mentioned the photograph once:
15   Now, she wants to make a point – the prosecutor made a point that I
16   knew that the cord was on the box.  I got the picture after she did.
17   They had it first.  They gave it to me at the last minute.  I didn't have
18   it.  How did I know a cord was on it?  [¶] Yeah, I scrutinized the
19   picture once I got it, and I scrutinized the receipt.  That's my
20   responsibility.  I'm the one being tried for the charge.  I'm supposed
21   to scrutinize it, and I'm supposed to pick out things such as that and
22   use that as a defense for myself.  [¶]  And it is a good defense.  It's
23   fabricated.  And it's up to you to ask yourself why it's fabricated.

24   (*Id.* at 220-21.)

25   After the jury convicted Petitioner, the court gave Petitioner time for his
26   court-appointed investigator to obtain more information about the validity of the
27   photographs. (*Id.* at 233-35.)  On April 2, 2003, Petitioner informed the court that,
28   according to Polaroid, the first four numbers on the back of People's 1 (0902)

11

1  indicated that the film was manufactured in September of 2002 (approximately
2  four months after Petitioner's arrest).  (*Id.* at 239.)
3          PETITIONER:  [Rojas] took the photographs on May 11, 2002.  It
4          was impossible for him to take a photograph with film that wasn't
5          manufactured yet.  The film wasn't manufactured until September of
6          2002.  [¶]  So how can he have possibly taken the picture with it on
7          May 11, 2002?  That's my position.
8  (*Id.* at 240.)  The parties then stipulated that the film part of the photograph was
9  not manufactured by Polaroid until September 2002.  (*Id.* at 243.)
10         Petitioner moved for a new trial.  The court denied Petitioner's motion for a
11  new trial, which was, in large part, based on the photograph and Rojas's false
12  testimony.  In denying the motion, the court stated that "Mr. Rojas did testify that
13  the picture merely reflects the items of property taken, without specifying the date
14  that he specifically took the picture as to those particular items."  (*Id.* at 248.)
15                                         III.
16                           **STANDARD OF REVIEW**
17         A federal court may not grant a petition for writ of habeas corpus by a
18  person in state custody with respect to any claim that was adjudicated on the
19  merits in state court unless it (1) "resulted in a decision that was contrary to, or
20  involved an unreasonable application of, clearly established Federal law, as
21  determined by the Supreme Court of the United States"; or (2) "resulted in a
22  decision that was based on an unreasonable determination of the facts in light of
23  the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d);
24  *Woodford v. Visciotti*, 537 U.S. 19, 21, 123 S. Ct. 357, 154 L. Ed. 2d 279 (2002)
25  (per curiam).
26         "'[C]learly established Federal law' . . . is the governing legal principle or
27  principles set forth by the Supreme Court at the time the state court rendered its
28  decision."  *Lockyer v. Andrade*, 538 U.S. 63, 71-72, 123 S. Ct. 1166, 155 L. Ed.

                                         12

2d 144 (2003). A state court's decision is "contrary to" clearly established Federal law if (1) it applies a rule that contradicts governing Supreme Court law; or (2) it "confronts a set of facts . . . materially indistinguishable" from a decision of the Supreme Court but reaches a different result. *Early v. Packer*, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002). A state court's decision cannot be contrary to clearly established Federal law if there is a "lack of holdings from" the Supreme Court on a particular issue. *Carey v. Musladin*, 127 S. Ct. 649, 654, 166 L. Ed. 2d 482 (2006).

Under the "unreasonable application prong" of section 2254(d)(1), a federal court may grant habeas relief "based on the application of a governing legal principle to a set of facts different from those of the case in which the principle was announced." *Lockyer*, 538 U.S. at 76; *see also Woodford*, 537 U.S. at 24-26 (state court decision "involves an unreasonable application" of clearly established federal law if it identifies the correct governing Supreme Court law but unreasonably applies the law to the facts).

A state court's decision "involves an unreasonable application of [Supreme Court] precedent if the state court either unreasonably extends a legal principle . . . to a new context where it should not apply, or unreasonably refuses to extend that principle to a new context where it should apply." *Williams v. Taylor*, 529 U.S. 362, 407, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).

"In order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous." *Wiggins v. Smith*, 539 U.S. 510, 520-21, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003) (citation omitted). "The state court's application must have been 'objectively unreasonable.'" *Id.* (citation omitted); *see also Clark v. Murphy*, 331 F.3d 1062, 1068 (9th Cir.), *cert. denied*, 540 U.S. 968 (2003).

"[S]tate court factual findings are presumed correct in the absence of clear and convincing evidence to the contrary." *Mitleider v. Hall*, 391 F.3d 1039, 1046

1  (9th Cir. 2004); *see also Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029,

2  154 L. Ed. 2d 931 (2003) ("Factual determinations by state courts are presumed

3  correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a

4  decision adjudicated on the merits in a state court and based on a factual

5  determination will not be overturned on factual grounds unless objectively

6  unreasonable in light of the evidence presented in the state-court proceeding, §

7  2254(d)(2).").

8          In applying these standards, this Court looks to the last reasoned State

9  court decision. *Davis v. Grigas*, 443 F.3d 1155, 1158 (9th Cir. 2006).  To the

10  extent no such reasoned opinion exists, as when a state court rejected a claim in

11  an unreasoned order, this Court must conduct an independent review to

12  determine whether the decisions were contrary to, or involved an unreasonable

13  application of, "clearly established" Supreme Court precedent. *Delgado v. Lewis*,

14  223 F.3d 976, 982 (9th Cir. 2000).  If the state court declined to decide a federal

15  constitutional claim on the merits, this Court must consider that claim under a *de*

16  *novo* standard of review rather than the more deferential "independent review" of

17  unexplained decisions on the merits authorized by *Delgado*. *Lewis v. Mayle*, 391

18  F.3d 989, 996 (9th Cir. 2004) (standard of *de novo* review applicable to claim

19  state court did not reach on the merits).

20                                          **IV.**

21                  **GROUND NINE: <u>MOTION FOR NEW TRIAL</u>**

22          Petitioner argues that his motion for a new trial (LD 1 at 221-40) should

23  have been granted.  Petitioner argues that the government's chief witness, Rojas,

24  fabricated evidence and gave false testimony with respect to a photograph and a

25  cashier's receipt for the merchandise.[1]

26  _____

27          [1] Respondent's argument that Petitioner does not allege a constitutional violation is misplaced.  (Answer at 23.)  Petitioner's traverse elaborated the claim

28  made in the petition.  (Traverse at 22-23.)  The California Court of Appeal clearly understood the constitutional dimensions of the claim.  (Decision at 3.)  This Court

                                          14

1    "Deliberate deception of a court and jurors by the presentation of known
2    false evidence is incompatible with 'rudimentary demands of justice.'" *Giglio v.*
3    *United States*, 405 U.S. 150, 153, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972) (quoting
4    *Mooney v. Holohan*, 294 U.S. 103, 112, 55 S. Ct. 340, 79 L. Ed. 791 (1935)).
5    "'The same result obtains when the State, although not soliciting false evidence,
6    allows it to go uncorrected when it appears.'" *Giglio*, 405 U.S. at 153 (quoting
7    *Napue v. Illinois*, 360 U.S. 264, 269, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959)).
8    "When the 'reliability of a given witness may well be determinative of guilt or
9    innocence,' nondisclosure of evidence affecting credibility falls within this general
10   rule.' *Giglio*, 405 U.S. at 154 (citation omitted); *see Napue*, 360 U.S. at 269 ("The
11   principle that a State may not knowingly use false evidence, including false
12   testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty,
13   does not cease to apply merely because the false testimony goes only to the
14   credibility of the witness.").
15       To establish a *Mooney-Napue* violation, a habeas petitioner must show
16   three elements: "(1) the testimony (or evidence) was actually false, (2) the
17   prosecution knew or should have known that the testimony was actually false,
18   and (3) that the false testimony was material." *United States v. Zuno-Arce*, 339
19   F.3d 886, 889 (9th Cir. 2003), *cert. denied*, 540 U.S. 1208 (2004); *Hayes v.*
20   *Brown*, 399 F.3d 972, 984 (9th Cir. 2005).
21       Evidence is material under *Napue* if there is "any reasonable likelihood that
22   the false testimony could have affected the judgment of the jury." *Hayes*, 399
23   F.3d at 984 (citations omitted). "A new trial is required if 'the false testimony
24   could . . . in any reasonable likelihood have affected the judgment of the jury.'"
25   *Giglio*, 405 U.S. at 154 (quoting *Napue*, 360 U.S. at 271)).  This is true
26
27   _____
28   is required to construe pro se pleadings liberally.  *See Bretz v. Kelman*, 773 F.2d
     1026, 1027 n.1 (9th Cir. 1985).

1    "'irrespective of the good faith or bad faith of the prosecution.'" *Id.* at 153 (citation
2    omitted).

3              The California Court of Appeal decision, which is the last reasoned
4    decision under *Davis*, carefully laid out the history of the photograph, what
5    happened at trial, and what happened subsequent to Petitioner's conviction.
6    (Decision at 4-9.)  The Court of Appeal did not contest the existence of the first
7    two elements.  The Court of Appeal framed the sole issue as follows:

8              The real question is whether it is significant that [Petitioner] was
9              deprived of the opportunity to impeach Rojas with the date the film
10             was manufactured, as the meaning of the numbers stamped on the
11             back of the photograph was not learned until after the trial.

12   (*Id.* at 9-10.)  The court concluded that any error was harmless under *Chapman*
13   *v. California*, 386 U.S. 18, 24 (1967).  It reasoned as follows:

14             The problem with the date of the film does not mean the crime did
15             not occur. The photograph was not an important part of the People's
16             case. The prosecution relied on the observations of the store's loss
17             prevention officer, Rojas, which were corroborated by another store
18             employee, Doctolero, and by a deputy sheriff, Zimmerman. All three
19             witnesses saw the stolen merchandise and said it was accurately
20             reflected in the photograph. Their testimony was further supported by
21             the cash register receipts and loss prevention report. [Petitioner]'s
22             defense required the jurors to find that Wal-Mart and the sheriff's
23             department were in a conspiracy to pin the crime on him which the
24             jurors chose not to do.

25   (Decision at 10.)

26             The state court's reasoning was an objectively unreasonable application of
27   Supreme Court law, and its factual determinations were unreasonable in light of
28   the record before it.

16

A.   **Falsity**

The Court of Appeal conducted a harmless error analysis and, therefore, did not contest that the photograph and Rojas's testimony were false. Respondent, nevertheless, argues that the trial court's finding that the evidence was not false was a reasonable determination of the facts. The Court of Appeal, and not the trial court, produced the last reasoned decision that is the subject of federal habeas review. Even assuming that the trial court's finding is relevant here, it was an unreasonable determination of the facts based on the evidence before it.

Rojas testified that, after subduing Petitioner outside the store, he took the backpack, opened it, and took a photograph of the items. (LD 2 at 65.)

Q   Now, after you had subdued Mr. Brown, did you recover the backpack?

A   Yes.

Q   Did you look inside the backpack?

A   Yes, I did.

Q   What, if anything, did you see inside the backpack?

A   There was the power drill set, the men's clothing.

Q   Were these all the items that you had seen Mr. Brown earlier select from the store display and place in the backpack?

A   Yes.

Q   Now, did you take a photograph of those items?

A   Yes, I did.

Q   Do you have that with you today?

A   Yes, I do.

      *   *   *

[The photograph was marked as People's 1.]

Q   Mr. Rojas, I'm now showing you your own photograph, sir. Do you recognize that photograph?

17

1   A   Yes, I do.

2   Q   And how do you recognize that photograph?

3   A   It's a picture in front of me.

4   Q   Well, have you seen that picture before?

5   A   Yes, I have.

6   Q   When did you see it first?  When did you first see that photograph?

7   A   The day Mr. Brown – the day I recovered it from Mr. Brown.

8   Q   You recovered the photograph from Mr. Brown?

9   A   The merchandise.

10   Q   Who took the photograph?

11   A   I did.

12   (*Id.* at 65-66.)

13   The prosecutor clearly understood that Rojas testified he took the

14   photograph on the day of the alleged shoplifting.  When Rojas was recalled by

15   the defense, the prosecutor asked the following on cross:

16   Q   Mr. Rojas, you earlier testified, sir, that you unpacked Mr. Brown's

17        backpack and photographed the items you saw in there?

18   A   Yes, I did.

19   (*Id.* at 144.)[2]

20   The trial court clearly had the same understanding of Rojas's testimony.

21   During a discussion of jury instructions on the last day of trial (January 15, 2003),

22

23

24   _____

25   [2]  The prosecutor's understanding that the photograph was taken contemporaneously is also demonstrated by her argument to the trial court as to why the photograph had not been turned over to Petitioner earlier: "Mr. Rojas tells me that he told Deputy Zimmerman, who was the arresting deputy, that he had taken a couple of pictures, and asked Deputy Zimmerman if he wanted a copy.  Deputy Zimmerman inexplicably said, 'No, we don't need to fool with that,' which is the reason the People didn't turn them over to Mr. Brown earlier."  (*Id.* at 34.)  Rojas testified that he talked to a detective only on the day of the incident. (*Id.* at 70.)

1 | the trial court rejected Petitioner's request for a special instruction on destruction
2 | of evidence on the following basis:

3 | > The evidence presented during the trial was that they were not
4 | > destroyed.  But as a part of WalMart's policy and practice, they were
5 | > – first of all, a photograph was taken of those items.  And, secondly,
6 | > they were then rung up on a register reflecting what items were
7 | > taken and the value of those items. [¶] So the court is making a
8 | > finding that there was no such destruction of the evidence within the
9 | > contemplation of the law.  And the court will not give a special
10 | > instruction regarding destruction of the evidence.

11 | (*Id.* at 161.)

12 | Rojas's testimony clearly gave the jury the false impression that Rojas
13 | photographed the items that he saw Petitioner take.  After trial, at the hearing on
14 | Petitioner's motion for new trial, Petitioner informed the court that, according to
15 | Polaroid, the first four numbers on the back of People's 1 (0902) indicated that
16 | the film was manufactured in September of 2002.  (*Id.* at 239.)  Therefore, Rojas
17 | could not have taken the photograph of the items on the day of the incident, May
18 | 11, 2002. (*Id.* at 240.)  Given that the allegedly stolen items were unavailable
19 | (*see id.* at 38), Rojas did not photograph the items he saw Petitioner take.

20 | Respondent points to the trial court's contrary finding almost three months
21 | later at the hearing on Petitioner's motion for new trial (April 2, 2003) – that Rojas
22 | did not "specify[] the date that he specifically took the picture as to those
23 | particular items." (*Id.* at 248.)  The trial court's finding was clearly unreasonable
24 | in light of the evidence.

25 | **B.    Prosecution's Knowledge**

26 | As noted above, the Court of Appeal conducted a harmless error analysis
27 | and, therefore, did not contest the prosecution's knowledge.  The prosecution
28 | knew the evidence was false no later than the date of the hearing on Petitioner's

19

1  motion for new trial when the prosecution stipulated that the photograph's film

2  was not manufactured until September 2002.[3] (LD 2 at 243.)  *See Brady v.*

3  *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); *Hall v.*

4  *Director of Corrections*, 343 F.3d 976, 981 (9th Cir. 2003).

5      **C.**    **Materiality**

6       A new trial is not automatically required whenever false evidence is

7  discovered.  As discussed above, a new trial is required if there is any reasonable

8  likelihood that the false testimony could have affected the judgment of the jury.

9  *Giglio*, 405 U.S. at 154; *Napue*, 360 U.S. at 271; *Hovey v. Ayers*, 458 F.3d 892,

10  916 (9th Cir. 2006).  "'The question is not whether the defendant would more

11  likely than not have received a different verdict with the evidence, but whether in

12  its absence he received a fair trial, understood as a trial resulting in a verdict

13  worthy of confidence.'"  *Hovey*, 458 F.3d at 916 (citation omitted); *Morris*, 447

14  F.3d at 745 ("We must decide whether, despite the use of perjured testimony,

15  Petitioner received a 'trial resulting in a verdict worthy of confidence.'") (citation

16  omitted).

17       The Court of Appeal conducted a harmless error analysis under *Chapman*

18  instead of a materiality analysis.  On federal habeas review, no additional

19  harmless error analysis is necessary under *Brecht v. Abrahamson*, 507 U.S. 619,

20  113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993).  *Hayes*, 399 F.3d at 984-85 ("When

21  the Supreme Court has declared a materiality standard, as it has for this type of

22  constitutional error, there is no need to conduct a separate harmless error

23

24  ────────────

25     [3] The prosecution did no investigation of its own as to the genuineness of the photograph or the truth of Rojas's testimony.  "When a prosecutor suspects

26  perjury, the prosecutor must at least investigate.  The duty to act 'is not discharged by attempting to finesse the problem by pressing ahead without a

27  diligent and good faith attempt to resolve it.  A prosecutor cannot avoid this obligation by refusing to search for the truth and remaining willfully ignorant of the

28  facts.'"  *Morris v. Ylst*, 447 F.3d 735, 744 (9th Cir. 2006) (citations omitted), *cert. denied*, 127 S. Ct. 957 (2007).

1   analysis."). "[A] finding of materiality necessarily compels the conclusion that the
2   error was not harmless." *Id.*

3        Contrary to the Court of Appeal's analysis, the fact that the false evidence
4   goes only to credibility does not render it immaterial. "The principle that a State
5   may not knowingly use false evidence, including false testimony, to obtain a
6   tainted conviction, implicit in any concept of ordered liberty, does not cease to
7   apply merely because the false testimony goes only to the credibility of the
8   witness. The jury's estimate of the truthfulness and reliability of a given witness
9   may well be determinative of guilt or innocence." *Napue*, 360 U.S. at 269; *Hayes*,
10  399 F.3d at 986.

11       In assessing whether there is a reasonable likelihood that the false
12  evidence could have affected the judgment of the jury, the Supreme Court has
13  examined (1) whether there is independent, corroborating evidence; and (2) the
14  emphasis that the prosecutor placed on the witness's testimony. *See Banks v.*
15  *Dretke*, 540 U.S. 668, 700-01, 124 S. Ct. 1256, 157 L. Ed. 2d 1166 (2004)
16  (evidence impeached critical witness in case that lacked physical evidence);
17  *Kyles*, 514 U.S. at 444 ("The likely damage is best understood by taking the word
18  of the prosecutor.").

19       The state court's determination that there was independent evidence
20  corroborating Rojas's testimony was an unsupported and unreasonable
21  determination of the facts on the record. There was no videotape of the alleged
22  shoplifting, no allegedly stolen items, and no physical evidence. (LD 2 at 49);
23  *Hall*, 343 F.3d at 984. *No one* other than Rojas testified that Petitioner took
24  merchandise off the shelf, stuffed it in his backpack, and exited the store without
25  paying for it. Although the state court referred to Doctolero and Zimmerman, the
26  state court's finding is completely contradicted by the record. Doctolero testified
27  that he arrived at the store when Rojas was following Petitioner out of the store.
28  (LD 2 at 108.) Rojas confirmed that Doctolero arrived as Petitioner exited the

1  and that Doctolero had not been with Rojas before that time. (*Id.* at 61.)

2  Zimmerman testified that when he arrived, Petitioner was outside in the parking

3  lot, Rojas was in the security office, the allegedly stolen items were loose in the

4  security office and were not in any backpack. (*Id.* at 130-32.) Therefore, it is not

5  accurate to say that Doctolero and Zimmerman "saw the stolen merchandise."

6  (Decision at 10.) Doctolero and Zimmerman saw merchandise that Rojas

7  identified as having been stolen.[4] (LD 2 at 114-15, 126, 131-32.)

8        Nor do the cash receipts and loss prevention report constitute independent,

9  corroborating evidence. The loss prevention report was written by Rojas and,

10  therefore, does not independently corroborate his testimony. (*Id.* at 67.) *No one*

11  corroborated that the receipts reflected merchandise retrieved from Petitioner.

12  Doctolero testified that he did not see Rojas have the items scanned. (*Id.* at 114-

13  15.) Zimmerman testified that he did not recall seeing Rojas take items to a

14  cashier to be scanned, he did not see a receipt being generated, and he recalled

15  that a receipt was given to him 25 to 30 minutes after he arrived at the scene.

16  (*Id.* at 134-36.) Therefore, the reliability of the receipts and loss prevention report

17  depended exclusively on the testimony of Rojas.

18        Rojas was clearly the crucial witness in the prosecution's case against

19  Petitioner. *See Banks*, 540 U.S. at 700-01; *Horton v. Mayle*, 408 F.3d 570, 580

20  (9th Cir. 2005) (evidence that would have impeached witness who was central to

21  the prosecution's case might well have altered outcome of trial); *Hayes*, 399 F.3d

22  at 986 (witness's testimony and credibility were crucial to prosecution's case

23  when other evidence was circumstantial); *Benn v. Lambert*, 283 F.3d 1040, 1054

24  (9th Cir.) (critical witness), *cert. denied*, 537 U.S. 942 (2002).

25

26        [4] Nor did Doctolero testify that the "stolen merchandise . . . was accurately
reflected in the photograph." (Decision at 10.) While Doctolero was viewing the

27  photograph, Doctolero recognized it based only on "the drill box and the hat." (LD
2 at 114.) Zimmerman did not recall Rojas offering to give him a photograph. (*Id.*

28  at 132.)

1    The fact that Rojas was critical to the prosecution's case is confirmed by

2  the prosecution's closing argument.  In her closing, the prosecutor relied

3  exclusively on Rojas's testimony to prove the elements of robbery.[5] (*Id.* at 203-

4  08.)  The prosecution also relied on the photograph.  (*Id.* at 211.)  The

5  prosecution referred to Doctolero solely in reference to the use of force on

6  Petitioner.  (*Id.* at 207.)  The prosecution's closing argument weighs in favor of

7  Petitioner in assessing whether there is a reasonable likelihood that the false

8  testimony could have affected the judgment of the jury.  *Kyles*, 514 U.S. at 444;

9  *Horton*, 408 F.3d at 580 (when prosecution emphasizes witness's testimony and

10  credibility, impeachment of that witness may significantly damage the

11  prosecution's case).

12    Finally, the state court's speculation that Petitioner's defense required the

13  jurors to find that Wal-Mart and the sheriff's department "were in a conspiracy to

14  pin the crime on him" is unreasonable and insufficient to defeat Petitioner's

15  showing of a reasonable likelihood that the false testimony could have affected

16  the judgment of the jury.  (Decision at 10.)  Given that the prosecution's entire

17  case depended upon Rojas, Petitioner's defense did not depend on any

18  conspiracy.

19    In *Giglio*, the case most directly on point, Taliento, chief witness for the

20  prosecution and an alleged co-conspirator of the defendant, testified that no one

21  promised him anything in exchange for his testimony against the defendant.

22  *Giglio*, 405 U.S. at 151.  In Giglio's motion for a new trial based on newly

23  discovered evidence, the government admitted that Assistant U.S. Attorney

24  DiPaola[6] had promised Taliento that he would not be prosecuted in exchange for

25

26    [5]  The prosecution described Rojas to the court as its "primary witness."
27  (LD 2 at 21.)

28    [6]  DiPaola presented the government's case before the grand jury but was
   not involved at trial.

his testimony. *Id.* at 152. Thus, although the prosecution at trial was unaware of the promise, they found out during the briefing on Giglio's motion for a new trial. Because the government's case "depended almost entirely on Taliento's testimony, . . . Taliento's credibility as a witness was therefore an important issue in the case, and evidence of any understanding or agreement as to future prosecution would be relevant to his credibility and the jury was entitled to know it." *Id.* at 154-55. Accordingly, the court found that Giglio's due process rights were violated and remanded for a new trial. *Id.* at 155.

Here, the prosecution stipulated after trial that the photograph of the allegedly stolen items could not have been taken on the date of the alleged robbery – or, indeed, at any time close to that date. (LD 2 at 243.) Therefore, the photograph could not possibly be a contemporaneous depiction of the allegedly stolen items. This impeachment evidence was qualitatively different than any other type of cross-examination Petitioner had available to him. Without it, Rojas simply denied that the photograph did not depict actual stolen items. (*Id.* at 86.)

Rojas was the witness whose reliability was determinative of guilt or innocence. *Napue*, 360 U.S. at 269. "[W]here a witness is central to the prosecution's case, the defendant's conviction demonstrates that the impeachment evidence presented at trial did not suffice to convince the jury that the witness lacked credibility. In such cases, we noted, the suppressed impeachment evidence 'takes on an even greater importance.'"[7] *Horton*, 408 F.3d at 581 (citation omitted); *Hayes*, 399 F.3d at 987 (same). The due process violation was material, and the false evidence undermines any confidence in the verdict. *Giglio*, 405 U.S. at 154.

---

[7] Petitioner attempted to point out inconsistencies among Rojas's testimony, the photograph, and the receipts. The trial judge's questioning suggested a possible resolution of one inconsistency. (LD 2 at 99.) The fact that Petitioner had some cross-examination available does not turn "what was otherwise a tainted trial into a fair one." *Napue*, 360 U.S. at 270.

1    For these reasons, it is recommended that the petition be granted.

2                                              **V.**

3                         **PETITIONER'S REMAINING GROUNDS**

4        **A.    GROUND ONE:  Preservation of the Evidence**

5            The government violates a defendant's due process rights when it fails to

6    preserve evidence in a criminal case if (1) the evidence "might be expected to

7    play a significant role in the suspect's defense," (2) the evidence has exculpatory

8    value, (3) the exculpatory value must be apparent before the evidence is

9    destroyed, (4) the defendant must be "unable to obtain comparable evidence by

10   other reasonably available means," and (5) the government must have acted in

11   bad faith.  *California v. Trombetta*, 467 U.S. 479, 488-89, 104 S. Ct. 2528, 81 L.

12   Ed. 2d 413 (1984) (citations and footnote omitted); *Arizona v. Youngblood*, 488

13   U.S. 51, 58, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988).

14           Petitioner contends that the government failed to preserve the evidence of

15   the stolen merchandise.

16           The California Court of Appeal decision, which was the last reasoned

17   decision under *Davis*, applied the correct legal standard.  (Decision at 4.)  The

18   court concluded that there was no reason for anyone to think the merchandise

19   would play a significant role in the defense, that it had any exculpatory value, or

20   that the government had acted in bad faith.  (*Id.*)

21           Petitioner does not successfully rebut the findings of the state court.

22   Instead, he argues that the police ignored Cal. Penal Code § 1407, which

23   provides that "[w]hen property, alleged to have been stolen or embezzled, comes

24   into the custody of a peace officer, he shall hold it subject to the provisions of this

25   chapter relating to the disposal thereof."  (Traverse at 3.)  Petitioner concedes

26   that this statute is designed to protect the lawful owner of the property, not the

27   preservation of evidence.  (*Id.*)  Nonetheless, he argues that the police here did

28   not dispose of the property pursuant to proper procedure.  (*Id.*)

                                              25

1         Just as in *Trombetta*, the stolen items were more likely to be inculpatory

2 than exculpatory evidence at the time.[8]  The photographs and receipts turned out

3 to be unreliable.  Thus, absent the stolen items, "a more direct constitutional

4 attack might be made on the sufficiency of the evidence underlying the State's

5 case."  *Trombetta*, 467 U.S. at 489 n.10.  Petitioner has not made a sufficiency-

6 of-the-evidence argument here.

7         Nor does Petitioner's theory support a conclusion that the government

8 acted in bad faith.  Therefore, Petitioner's claim fails.

9         **B.**     **GROUND TWO: <u>Disclosure of the Evidence</u>**

10         In *Brady v. Maryland*, 373 U.S. at 86, the Supreme Court recognized a

11 prosecutor's obligation to disclose exculpatory evidence, whether substantive or

12 for impeachment purposes, when such evidence is "material" to the defense. To

13 establish a *Brady* violation, a petitioner must show that the evidence was

14 favorable to him, because it is either exculpatory or impeaching; the evidence

15 must have been suppressed by the prosecution; and the petitioner must have

16 been prejudiced by the non-disclosure. *Strickler v. Greene*, 527 U.S. 263, 281-82,

17 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999).  Evidence is material "only if there is a

18 reasonable probability that, had the evidence been disclosed to the defense, the

19 result of the proceeding would have been different." *United States v. Bagley*, 473

20 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985). The fact that information

21 might help the defense does not establish the materiality required for

22 constitutionally-compelled discovery. *United States v. Agurs*, 427 U.S. 97,

23 109-110, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976).

24         Petitioner argues that the government failed to turn over the items alleged

25

26       [8]  *Youngblood* emphasized that "the exculpatory value of the evidence
must be apparent '*before* the evidence was destroyed.'"  *Youngblood*, 488 U.S. at
27 56 n.* (emphasis added by *Youngblood*) quoting from *Trombetta*, 467 U.S. at
489)).  The exculpatory value is not apparent when the evidence is "simply an
28 avenue of investigation that might have led in any number of directions." *Id.*

to have been stolen, the photograph, the second receipt, and his backpack. (Traverse at 15.)[9]  The government could not have turned over the stolen merchandise or his backpack because, as Petitioner knows, it was not in the government's possession.  That issue has already been addressed in Ground One.  The government turned over the photographs as soon as it received them from Rojas. (LD 2 at 33-36.)  As to the second receipt, based on the record, the government turned it over as soon as it was received from Rojas. (LD 2 at 36-38.)  There was no prejudice to Petitioner as he was still able to use it for impeachment purposes.  Thus, Petitioner's claim fails.

        **C.    GROUNDS THREE, SEVEN, AND TEN:  <u>Jury Instructions</u>**

     "The only question . . . is 'whether [a jury] instruction by itself so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. 62, 72, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991) (quoting from *Cupp v. Naughten*, 414 U.S. 141, 147, 94 S. Ct. 396, 38 L. Ed. 2d 368 (1973)).

"[I]t must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some [constitutional right].'" *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974).  "[W]e 'have defined the category of infractions that violate "fundamental fairness" very narrowly.'" *Estelle*, 502 U.S. at 72-73 (quoting from *Dowling v. United States*, 493 U.S. 342, 352, 110 S. Ct. 668, 107 L. Ed. 2d 708 (1990)).  Here, with respect to Grounds Three and Seven, Petitioner's "burden is especially heavy" because "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Henderson v. Kibbe*, 431 U.S. 145, 155, 97 S. Ct. 1730, 52 L. Ed. 2d 203 (1977).

---

     [9]  The California Court of Appeal decision, which was the last reasoned decision under *Davis*, concluded that any error was harmless. (Decision at 10.)

1        Because no reasoned state-court opinion exists on these grounds, this

2   Court has conducted an independent review to determine whether the denial of

3   relief was contrary to, or involved an unreasonable application of, "clearly

4   established" Supreme Court precedent.  *Delgado*, 223 F.3d at 982.

5           **1.**    **Ground Three - Failure to Instruct the Jury Re Late**

6   **Disclosure**

7        Petitioner argues that the trial court erred by refusing to give a jury

8   instruction about the late disclosure of the photographs and the second receipt.

9   (Traverse at 9.)

10       Because the Court has already found no merit to Petitioner's argument in

11  Ground Two that the prosecution's late disclosure violated his due process rights,

12  there is no basis for giving a jury instruction regarding the late disclosure.  The

13  jury instruction indicates that the prosecution's untimely disclosure "was without

14  lawful justification," which is false.  (Traverse at 9 (quoting from CALJIC No.

15  2.28)); *see also United States v. Del Muro*, 87 F.3d 1078, 1081 (9th Cir. 1996) (a

16  defendant is not entitled to an instruction unless it is supported by law).

17       Petitioner's claim fails.

18          **2.**    **Ground Seven - Failure to Give Pinpoint Instruction**

19       Petitioner does not explain in his petition what instruction the trial court

20  failed to give.  Petitioner does not elaborate on this ground in his Traverse.

21       Accordingly, Petitioner's claim fails.

22          **3.**    **Ground Ten - Special Instruction**

23       Petitioner contends that, over his objection, the trial court instructed the jury

24  with an "instruction called 'user C.'" (Petition at 6.)  The instruction at issue is:

25          Robbery is a continuing offense that begins from the time of the

26          original taking until the robber reaches a place of relative safety.  It is

27          sufficient to support a conviction that [defendant] used force to

28

1    prevent the guard from retaking the property or to facilitate his

2    escape.

3  (LD 1 at 173.)  Petitioner objected at the time on the basis that the instruction was

4  "argumentative," which the court overruled.  (LD 2 at 150.)  Petitioner does not

5  explain in what way the instruction is argumentative.

6         "[T]he duty of the court is fully discharged if the instructions given by the

7  court embrace all the points of the law arising in the case." *Hyatt v. Sierra Boat*

8  *Co.*, 79 Cal. App. 3d 325, 335, 145 Cal. Rptr. 47 (1978) (citations omitted).  "A

9  party is not entitled to have the jury instructed in any particular phraseology and

10  may not complain on the ground that his requested instructions are refused if the

11  court correctly gives the substance of the law applicable to the case." *Id.*  An

12  instruction may be argumentative if it "impl[ies] certain conclusions from specified

13  evidence." *People v. Yeoman*, 31 Cal. 4th 93, 131, 2 Cal. Rptr. 3d 186, *cert.*

14  *denied*, 541 U.S. 991 (2003).  Even assuming that the last sentence of the

15  instruction is argumentative, Petitioner offers no support for the proposition that

16  the instruction so infected his trial as to be a violation of due process. *Estelle*,

17  502 U.S. at 72.  Two witnesses, Rojas and Doctolero, both testified that Petitioner

18  used force against Rojas, which satisfied this particular element of robbery.

19         Petitioner's claim fails.

20      **D.    GROUNDS FOUR AND SIX: <u>Ineffective Assistance of Counsel</u>**

21         *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674

22  (1984), is the "clearly established Federal law" on these grounds.  To succeed on

23  a claim of ineffective assistance of trial counsel, Petitioner must demonstrate that

24  his attorney's performance was deficient and that the deficient performance

25  prejudiced the defense. *Id.* at 687; *Wiggins*, 539 U.S. at 521.  The petitioner

26  bears the burden of establishing both components. *Williams*, 529 U.S. at 390-91;

27  *Smith v. Robbins*, 528 U.S. 259, 285-86, 120 S. Ct. 746, 145 L. Ed. 2d 756

28  (2000).  "Deficient performance is performance which is objectively unreasonable

29

1  under prevailing professional norms." *Hughes v. Borg*, 898 F.2d 695, 702 (9th

2  Cir. 1990) (citing *Strickland*, 466 U.S. at 688).  Prejudice "focuses on the question

3  whether counsel's deficient performance renders the . . . proceeding

4  fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S. Ct. 838,

5  122 L. Ed. 2d 180 (1993); *Williams*, 529 U.S. at 393 n. 17.  The Court need not

6  address both components if Petitioner makes an insufficient showing on one.

7  *Strickland*, 466 U.S. at 697.

8       The *Strickland* test also applies to claims of ineffective assistance by

9  appellate counsel.  *See Smith v. Murray,* 477 U.S. 527, 536, 106 S. Ct. 2661, 91

10  L. Ed. 2d 434 (1986); *see also Smith*, 528 U.S. at 285-86 ("the proper standard

11  for evaluating [a petitioner's] claim that appellate counsel was ineffective . . . is

12  that enunciated in *Strickland*").  The test for deficient performance is the same as

13  for trial counsel.  *Id.* at 285 (petitioner "must first show that his counsel was

14  objectively unreasonable").  To establish prejudice, a petitioner "must show a

15  reasonable probability that, but for his counsel's [error], he would have prevailed

16  on his appeal." *Id.* (citation omitted).  Appointed appellate counsel is not required

17  "to press nonfrivolous points requested by the client, if counsel, as a matter of

18  professional judgment, decides not to present those points." *Jones v. Barnes*,

19  463 U.S. 745, 751, 103 S. Ct. 3308, 77 L. Ed. 2d 987 (1983).  "[A] per se rule that

20  the client, not the professional advocate, must be allowed to decide what issues

21  are to be pressed . . . seriously undermines the ability of counsel to present the

22  client's case in accord with counsel's professional evaluation." *Id.*  "There can

23  hardly be any question about the importance of having the appellate advocate

24  examine the record with a view to selecting the most promising issues for review."

25  *Id.* at 752.

26       Because no reasoned state-court opinion exists on these grounds, this

27  Court has conducted an independent review to determine whether the denial of

28

30

1   relief was contrary to, or involved an unreasonable application of, "clearly
2   established" Supreme Court precedent.  *Delgado*, 223 F.3d at 982.

3         **1.**  **Ground Four - Ineffective Assistance of Appellate Counsel**

4       Petitioner argues that his appellate counsel was deficient by failing to raise
5   on appeal Petitioner's Fourth Amendment claim and the denial of his motion for a
6   new trial. (Traverse at 28.)  Petitioner also argues that his appellate counsel
7   failed "to effectively argue his destruction of evidence claim." (*Id.*)

8       Petitioner's Fourth Amendment claim was clearly meritless (*see* Ground
9   Five below).  With respect to the motion for a new trial, the underlying reasons
10  (the fabricated evidence and perjured testimony) for that claim were raised and
11  addressed by the Court of Appeal.  As already noted in the Court's analysis of
12  Ground One, Petitioner's theory that Cal. Penal Code § 1407 has relevance to
13  the "destruction" of the evidence has no merit.  Finally, his argument that counsel
14  argued ineffectively is conclusory and without support.[10]  *See James v. Borg*, 24
15  F.3d 20, 26 (9th Cir.) ("Conclusory allegations which are not supported by a
16  statement of specific facts do not warrant habeas relief.") (citation omitted), *cert.*
17  *denied sub nom. James v. White*, 513 U.S. 935 (1994).

18      Petitioner's claim fails.  *See Turner v. Calderon*, 281 F.3d 851, 872 (9th Cir.
19  2002) ("A failure to raise untenable issues on appeal does not fall below the
20  *Strickland* standard."); *Jones,* 463 U.S. at 751 (Appellate counsel is not required
21  "to press nonfrivolous points requested by the client, if counsel, as a matter of
22  professional judgment, decides not to present those points").

23        **2.**  **Ground Six - Ineffective Assistance of Trial Counsel**

24      Petitioner argues that his investigator "failed to properly serve subpoenas
25  on critical defense witnesses." (Petition at 6.)  To the extent Petitioner is arguing
26  that he, as his own counsel, was ineffective for failing to ensure that the

27   

28      [10] As it was, the Court of Appeal complained that Petitioner's counsel
spent too much time on a meritless argument. (Decision at 4.)

31

1  subpoenas were properly served, that argument fails.[11]  *See Faretta v. California*,

2  422 U.S. 806, 834 n.46, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975) ("[A] defendant

3  who elects to represent himself cannot thereafter complain that the quality of his

4  own defense amounted to a denial of 'effective assistance of counsel.'").

5  **E.    GROUND FIVE: Section 1538.5 Motion**

6        In *Stone v. Powell*, 428 U.S. 465, 481-82, 96 S. Ct. 3037, 49 L. Ed. 2d

7  1067 (1976), the Supreme Court held that when "the State has provided an

8  opportunity for full and fair litigation of a Fourth Amendment claim, the

9  Constitution does not require that a state prisoner be granted federal habeas

10  corpus relief on the ground that evidence obtained in an unconstitutional search

11  or seizure was introduced at his trial."  "The relevant inquiry is whether petitioner

12  had the opportunity to litigate his claim, not whether he did in fact do so or even

13  whether the claim was correctly decided."  *Ortiz-Sandoval v. Gomez*, 81 F.3d 891,

14  899 (9th Cir. 1996) (citation omitted).

15        Petitioner contends that he "did not receive a full hearing on his motion to

16  suppress the evidence of the alleged stolen property."  (Petition at 6.)  On

17  December 17, 2002, Petitioner filed a motion to suppress any evidence seized on

18  the day of his arrest from his backpack.  (LD 1 at 110-35.)  On January 10, 2003,

19  Petitioner supplemented his motion.  (*Id.* at 139-45.)  On January 13, 2003, the

20  trial court denied the motion because the Walmart personnel are not state

21  actors.[12]  (LD 2 at 2.)  The gravamen of Petitioner's claim is that the trial judge's

22  ruling was summary and incorrect.  However, such a claim is not cognizable

23  under habeas.  *See Ortiz-Sandoval*, 81 F.3d at 899.

24        Petitioner's claim fails.

25

26        [11]  Petitioner offers no support for this contention, nor does he elaborate on
27  this ground in his traverse.

28        [12]  Petitioner's assertion that the deputies searched his backpack without
his consent has no support in the record.  (Traverse at 13 (citing to LD 2 at 116).)

32

1     **F.**    **GROUND EIGHT:**  **Admission of Unauthenticated Writings**

2         A claim involving only the application and/or interpretation of California law

3 is not cognizable on federal habeas review. *See* 28 U.S.C. § 2254(a); *Bradshaw*

4 *v. Richey*, 546 U.S. 74, 76, 126 S. Ct. 602, 604, 163 L. Ed. 2d 407 (2005) (per

5 curiam) ("[A] state court's interpretation of state law, including one announced on

6 direct appeal of the challenged conviction, binds a federal court sitting in habeas

7 corpus."); *Estelle*, 502 U.S. at 67-68 ("it is not the province of a federal habeas

8 court to reexamine state-court determinations on state-law questions"); *Smith v.*

9 *Phillips*, 455 U.S. 209, 221, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982) ("Federal

10 courts hold no supervisory authority over state judicial proceedings and may

11 intervene only to correct wrongs of constitutional dimension."); *Langford v. Day*,

12 110 F.3d 1380, 1389 (9th Cir. 1996) ("We accept a state court's interpretation of

13 state law, . . . and alleged errors in the application of state law are not cognizable

14 in federal habeas corpus.") (citation omitted), *cert. denied*, 522 U.S. 881 (1997).

15         Petitioner argues that Exhibits 1 (photograph), 2 (first receipt), and 3

16 (second receipt) were erroneously admitted because they were unauthenticated.

17 (Petition at 6.) Respondent argues that this claim is purely a state-law claim and

18 not cognizable here. (Answer at 22.) Petitioner does not rebut Respondent's

19 argument in his traverse. In addition, Petitioner had no objection to the admission

20 of these exhibits at trial.[13] (LD 2 at 139.)

21         Petitioner's claim fails.

22     **G.**    **GROUND ELEVEN:**  **Imposition of Upper Term**

23         "'Other than the fact of a prior conviction, any fact that increases the

24 penalty for a crime beyond the prescribed statutory maximum must be submitted

25 to a jury, and proved beyond a reasonable doubt.'" *Blakely v. Washington*, 542

26

27 _____

28       [13] Petitioner initially objected, but not on the basis of authentication. His objection was overruled. (LD 2 at 39.)

1  U.S. 296, 301, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004) (quoting *Apprendi v.*
2  *New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000)).

3       Because no reasoned state-court opinion exists on this ground, this Court
4  has conducted an independent review to determine whether the denial of relief
5  was contrary to, or involved an unreasonable application of, "clearly established"
6  Supreme Court precedent. *Delgado*, 223 F.3d at 982.

7       At sentencing, the trial court stated the following basis for imposing the
8  upper term:

9       The court is going to select the high-term as to [the robbery count] of
10      5 years in the state prison, high-term because the aggravated factors
11      exceed the mitigating factors.  The aggravating factors being the
12      defendant has previously served a prison term; and, secondly, the
13      defendant's prior convictions as an adult or adjudication as a juvenile
14      indicate they are serious and of increasing seriousness.  The court
15      found no mitigating factors.

16  (LD 2 at 260-61.)

17       Petitioner argues that the trial court's imposition of the upper term for
18  robbery violated his Sixth Amendment rights.[14]  (Petition at 6.)  Petitioner
19  concedes that "the alleged fact of a prior prison term is permissible under
20  *Apprendi*'s exception."  (Supplemental Traverse at 4.)  Nonetheless, he argues
21  first that under California law, "a fact underlying an enhancement cannot do
22  double duty."  (*Id.*)  Petitioner's prior conviction was used to impose the upper
23  term, it was used to double the upper term under California's Three Strikes Law,
24  and it was used as a five-year enhancement.  (*Id.* at 5.)  This scheme, according
25  to Petitioner, violates *Clemons v. Mississippi*, 494 U.S. 738, 110 S. Ct. 1441, 108

26
27       [14] Petitioner has withdrawn his argument that the sentence violates
28  *Cunningham v. California*, 127 S. Ct. 856, 860, 166 L. Ed. 2d 856 (2007).
   (Supplemental Traverse at 2.)

1   L. Ed. 2d 725 (1990) and *Hicks v. Oklahoma*, 447 U.S. 343, 100 S. Ct. 2227, 65

2   L. Ed. 2d 175 (1980).  First, this argument has never been presented to the

3   California Supreme Court and is therefore unexhausted.  (Answer, Exs. D, H.)

4           Second, in any event, the two cases Petitioner cites are unavailing.  In

5   *Hicks*, the defendant was charged with heroin distribution.  In accordance with a

6   state habitual offender statute, the jury was instructed that if they found the

7   defendant guilty, they must impose a prison term of 40 years, which they did.

8   *Hicks*, 477 U.S. at 344-45.  Subsequent to the defendant's conviction but during

9   his direct appeal, the state courts declared the habitual offender statute to be

10  unconstitutional.  The defendant argued on appeal that his conviction should be

11  reversed, but the state appellate court said he was not prejudiced because "his

12  sentence was within the range of punishment that could have been imposed in

13  any event." *Id.* at 345.  The Supreme Court held that the state's conclusion under

14  state law rested "on the frail conjecture that a jury *might* have imposed a

15  sentence equally as harsh . . . [and that] [s]uch an arbitrary disregard of the

16  petitioner's right to liberty is a denial of due process of law." *Id.* at 346 (emphasis

17  in original) (footnote omitted).

18          Petitioner's case does not fit into the narrow violation of due process

19  carved out by *Hicks*.  The Supreme Court has subsequently explained its holding

20  in *Hicks*. *See Clemons*, 494 U.S. at 746 ("[W]hen state law creates for a

21  defendant a liberty interest in having a jury make particular findings, speculative

22  appellate findings will not suffice to protect that entitlement for due process

23  purposes"); *Cabana v. Bullock*, 474 U.S. 376, 388 n.4, 106 S. Ct. 689, 88 L. Ed.

24  2d 704 (1986) ("In *Hicks*, we held only that where state law creates for the

25  defendant a liberty interest in having the jury make particular findings, the Due

26  Process Clause implies that appellate findings do not suffice to protect that

27  entitlement.") (*overruled on other grounds by Pope v. Illinois*, 481 U.S. 497, 503

28  n.7, 107 S. Ct. 1918, 95 L. Ed. 2d 439 (1987)).  *Hicks* does not provide any

35

general authority for a federal habeas court to dispute a state's interpretation of its own laws. *Clemons*, 494 U.S. at 747; *Cabana*, 474 U.S. at 388 n.4.[15]

Petitioner's second argument is that the trial court's finding that his prior convictions were "serious and of increasing seriousness" violated *Blakely*. Petitioner does not challenge the substance of the finding, simply that it wasn't the province of the trial court to make it. (Supplemental Traverse at 5.)  The trial court found that Petitioner had two prior convictions, both for robbery. (LD 2 at 258.)  The court found that both robberies constituted "serious felonies." (*Id.*)  The trial court's finding of seriousness in the imposition of the upper term was inherent in the convictions themselves. *See United States v. Harris*, 447 F.3d 1300, 1303-05 (10th Cir. 2006) (finding that defendant's priors were committed on separate occasions was "inherent in the fact of conviction"). In *United States v. Thompson*, 421 F.3d 278, 282 (4th Cir. 2005), *cert. denied*, 547 U.S. 1005 (2006), the court concluded that a conviction "also contains other operative facts, such as the statute which was violated and the date of the conviction." The court also found that a trial court could "rely on a variety of conclusive court documents when determining the nature of a prior conviction." *Id.* at 281.  In Petitioner's case, the trial court noted the statute Petitioner violated in his prior convictions, Cal. Penal Code § 211. (LD 2 at 258.)  Section 211 is the statute that defines robbery. California classifies robbery as a "serious felony." Cal. Penal Code §

---

[15] Similarly, the circuits have applied *Hicks* narrowly. *See Hubbart v. Knapp*, 379 F.3d 773, 780 (9th Cir. 2004) ("state courts must generally comply with state laws in sentencing prisoners"), *cert. denied*, 543 U.S. 1071 (2005); *Walker v. Deeds*, 50 F.3d 670, 672 (9th Cir. 1995) ("the state court's failure to abide by its procedures violated his due process rights"); *Dupuy v. Butler*, 837 F.2d 699, 703 (5th Cir. 1988) ("Later cases have interpreted the liberty interest recognized in *Hicks* as entitling the state criminal defendant to a sentencing decision *by the sentencing authority designated under state law*") (emphasis in original); *Carter v. Bowersox*, 265 F.3d 705, 715 (8th Cir. 2001) ("*Hicks* . . . represent[s] a rather narrow rule: some aspects of the sentencing process, created by state law, are so fundamental that the state must adhere to them in order to impose a valid sentence") (internal quotation marks and citation omitted), *cert. denied sub nom. Carter v. Leubbers*, 535 U.S. 999 (2002).

1   1192.7(c)(19).  Thus, the trial court's finding that the robberies were serious was

2   inherent in the fact of the convictions.

3        Petitioner's claim fails.

4                                    **VI.**

5                          **RECOMMENDATION**

6        For the reasons discussed above, it is recommended that the District Court

7   issue an Order (1) adopting this Report and Recommendation; (2) granting the

8   petition with respect to Ground Nine; (3) denying the petition in all other respects;

9   and (4) issuing a conditional writ of habeas corpus as follows:  Respondent shall

10  discharge Petitioner from all adverse consequences of his conviction in Los

11  Angeles Superior Court Case No. VA071021, unless the State of California elects

12  within ninety (90) days of this judgment becoming final (meaning the conclusion

13  of any and all appeals) to retry Petitioner.

14

15  DATED: November 20, 2007                    _____
                                                ALICIA G. ROSENBERG
16                                              United States Magistrate Judge

17

18

19

20

21

22

23

24

25

26

27

28

                                    37